RECEIVED
JUL 27 2010
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**ALEXANDRIA DIVISION**

| | |
|---|---|
| **WESLEY DALTON MEDFORD** | **CIVIL ACTION NO. 1:08-cv-00804** |
| **-vs-** | **JUDGE DRELL** |
| **ODAY LAVERGNE** | **MAGISTRATE JUDGE KIRK** |

## R U L I N G

Pending before the Court is a Motion for Summary Judgment (Doc. 65) filed by Third Party Defendant State Farm Fire & Casualty Co. ("State Farm"), against the Defendant, Oday Lavergne ("Mr. Lavergne"). The motion seeks dismissal of all claims filed against State Farm in its capacity as Mr. Lavergne's insurer. After careful consideration, State Farm's motion will be GRANTED IN PART AND DENIED IN PART, as specified below. Disposition will follow by a separate judgment.

I.   **Background**

This is a defamation lawsuit in which Mr. Lavergne is accused of making false and derisive statements about the Plaintiff, Wesley Dalton Medford ("Mr. Medford"). State Farm's motion concerns whether certain insurance policies issued to Mr. Lavergne and his privately-owned business provide liability coverage for the defamation claims, or obligate State Farm to provide a defense for Mr. Lavergne against those claims.

Mr. Medford is an Australian citizen and CEO and Chairman of PIVoD

Technologies, L.L.C. ("PIVoD").[1]  (Doc. 1).  PIVoD manufactures digital multimedia systems for large venues.  Mr. Lavergne formerly served as a member of PIVoD's "Board of Managers."  As we will discuss more fully below, Mr. Lavergne also played an instrumental role in the establishment and maintenance of the company as an American entity.

Mr. Medford filed the instant lawsuit on June 6, 2008.  (Doc. 1).  In the complaint, he alleges that Mr. Lavergne "commenced with a campaign designed to undermine the integrity and credibility of Plaintiff Medford in the eyes of PIVoD['s] . . . membership and management."  (Doc. 1, p. 3).  More specifically, Mr. Medford claims that Mr. Lavergne, through verbal communications and emails copied to other PIVoD employees, falsely accused him of various acts of mismanagement and self-dealing as an officer of PIVoD.  These assailments, Mr. Medford claims, were intended to embarrass Mr. Medford and impugn his business reputation.  The complaint originally sought damages against Mr. Lavergne for defamation and breach of fiduciary duty.  On July 24, 2008, the Court granted a Motion for Partial Voluntary Dismissal (Doc. 7) filed by Mr. Medford, dismissing without prejudice the breach of fiduciary count in the complaint.  (Doc. 8).

Subsequently, on September 30, 2008, Mr. Lavergne filed a third party demand

---

[1] The pleadings and evidence contain references to other domestic and foreign companies whose names include "PIVoD" as well.  For purposes of clarity, our use of the name "PIVoD" alone refers only to PIVoD Technologies, L.L.C., a Delaware limited liability company with offices in Alexandria, Louisiana.  When referring to other entities which also bear the name "PIVoD" in part, we will include the entire name of the entity if possible, or distinguish the entity from PIVoD in some other manner.

against State Farm. (Doc. 22).[2]  Therein, Mr. Lavergne averred that he "is entitled to both indemnity and defense from State Farm against the claims of Medford and their refusal to provide coverage has been arbitrary, capricious, and without probable cause, thus entitling Lavergne to damages for failure to defend." (Doc. 22, p. 1). State Farm seeks summary judgment based upon certain provisions and exclusions in the five insurance policies that it issued to Mr. Lavergne.  After carefully reviewing both parties' filings on this motion, we are now prepared to rule.

## II.    Law and Analysis

### A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), the Court will grant a party's motion for summary judgment only if:

> the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

In conducting this analysis, the Court must construe "all of the evidence and all of the factual inferences from the evidence . . . in a light most favorable to the party opposing the motion."  King Realty Co., Inc. v. Chevron USA, Inc., 575 F.3d 510, 517 (5th Cir. 2009).  Any doubts are likewise resolved in favor of the nonmoving party.

---

[2]  Mr. Lavergne had earlier filed a third party complaint against Twin City Fire Insurance Co. ("Twin City"), citing a policy issued by the company which provided coverage to directors and officers of PIVoD. (Doc. 9).  Mr. Lavergne's claims against Twin City were dismissed pursuant to an unopposed motion for summary judgment.  (Doc. 73).

U.S. *ex rel.* Longhi v. United States, 575 F.3d 458, 465 (5th Cir. 2009). Once the movant has directed the Court's attention to portions of the record which reflect the absence of a genuine issue of material fact, the nonmoving party bears the burden of demonstrating that a genuine issue of material fact exists. United States v. $ 92,203.00 in U.S. Currency, 537 F.3d 504, 506-07 (5th Cir. 2008). "However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment." Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996).

### B.    Rules of Interpretation

In diversity cases such as this, we must apply the substantive law of the forum state, as interpreted by the state's highest court. See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 399 (5th Cir. 2008). Because Mr. Lavergne's insurance policies were delivered in Louisiana, we interpret them applying Louisiana substantive law. See Thermo Terratech v. GDC Enviro-Solutions, Inc., 265 F.3d 329, 334 (5th Cir. 2001). The Louisiana Supreme Court has provided the following summary of the rules governing the interpretation of insurance policies:

> Interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment. An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. Words and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.
>
> An insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond

4

what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Unless a policy conflicts with statutory provisions or public policy, it may limit an insurer's liability and impose and enforce reasonable conditions upon the policy obligations the insurer contractually assumes.

If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer and in favor of coverage. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. That strict construction principle, however, is subject to exceptions. One of these exceptions is that the strict construction rule applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations. For the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable.

Huggins v. Gerry Lane Enters., Inc., 957 So. 2d 127, 129 (La. 2007) (quoting Bonin v.

Westport Ins. Corp., 930 So. 2d 906, 910-11 (La. 2006)).

### C.   Discussion

Mr. Lavergne concedes that he has no relevant coverage under two of the five policies issued to him by State Farm.  These policies cover his private business, Agilus Health, Inc., which is completely unrelated to his associations with PIVoD. Therefore, only three policies remain for consideration: (1) Mr. Lavergne's Homeowner's Policy (Doc. 65-2, Exh. 1); (2) a Business Policy issued in favor of Mr. Lavergne (Doc. 65-4, Exh. 3); and (3) Mr. Lavergne's Personal Liability Umbrella Policy (Doc. 65-3, Exh. 2).  We will consider each of these policies in turn.

#### 1.   *Homeowner's Policy*

State Farm argues that coverage under the Homeowner's Policy does not

extend to defamation claims. The policy includes coverage for "Personal Liability"
under the following provisions:

> If a claim is made or a suit is brought against an insured for damages
> because of **bodily injury** or **property damage** to which this coverage
> applies, caused by an **occurrence**, we will:
> 1.     pay up to our limit of liability for the damages for which the
>    **insured** is legally liable; and
> 2.     provide a defense at our expense by counsel of our choice.

(Doc. 65-2, Exh. 1, p. 15) (emphasis in original). The policy defines the term

"occurrence" as "an accident, including exposure to conditions, which results in . . .

bodily injury; or . . . property damage . . . during the policy period. Repeated or

continuous exposure to the same general conditions is considered to be one

occurrence." (Doc. 65-2, p. 2). "'[B]odily injury' means physical injury, sickness, or

disease to a person," including "required care, loss of services and death resulting

therefrom," but not including "emotional distress, mental anguish, humiliation,

mental distress, mental injury, or any similar injury unless it arises out of actual

physical injury to some person." (Doc. 65-2, p. 1). Finally, "property damage" is

defined as "physical damage to or destruction of tangible property, including loss of

use of this property," but excluding "theft or conversion of property" by the insured.

(Doc. 65-2, p. 2).

      The terms of personal liability coverage under Mr. Lavergne's Homeowner's

Policy are unambiguous and limiting. Under these provisions, State Farm is not

obligated to provide coverage or a defense to Mr. Lavergne against the claims in this

suit, as they do not arise from an "occurrence," and do not involve "bodily injury" or

6

"property damage."  Although counsel for Mr. Lavergne cursorily argues that two

exclusions listed in the Homeowner's Policy do not apply, counsel provides us with

no alternative reading of the coverage provisions.  Counsel also points to no other

provisions which may provide coverage to Mr. Lavergne for these claims.  Because no

coverage exists under the Homeowner's Policy, we do not reach the issue of whether

the policy exclusions may apply to preclude coverage.

Where, as here, the "language in the policy is clear, unambiguous, and

expressive of the intent of the parties, the agreement must be enforced as written."

Sibley v. Deer Valley Homebuilders, Inc., 32 So. 3d 1034, 1039 (La. App. 2d Cir. 2010).

We find no genuine issue of material fact regarding whether Mr. Lavergne's

Homeowner's Policy provides coverage for the claims in the principal litigation, and

State Farm is entitled to judgment as a matter of law on this claim.  Therefore, State

Farm's Motion for Summary Judgment (Doc. 65) will be GRANTED as it applies to Mr.

Lavergne's Homeowner's Policy.

     2.   *Business Policy*

Next, State Farm contends that coverage does not extend to Mr. Lavergne's

alleged tort under his Business Policy.  This argument is rooted in the "Designation of

Insured" section of the policy.  The relevant provision states that, "[i]f you are

designated in the Declaration as . . . an individual, you and your spouse are insureds

but only with respect to the conduct of a business of which you are the sole owner."

(Doc. 65-4, p. 27).  This limiting clause clearly narrows the scope of coverage under

the policy to liability arising from the operation of an individual's wholly-owned business.

Here, it is uncontested that Mr. Lavergne is designated as an individual in the Declarations section of the policy.  Therefore, pursuant to the unambiguous language of the policy, Mr. Lavergne and his spouse qualify as insureds, but only regarding any business which Mr. Lavergne solely owns.  There is, however, no allegation that Mr. Lavergne is the sole owner of PIVoD.  Indeed, as State Farm points out, Mr. Lavergne alleges that there were other members of the company.  As such, Mr. Lavergne does not qualify as an insured under the policy with regard to his activities as a manger of PIVoD.  Because coverage for business liability under the policy is contingent upon Mr. Lavergne's status as an "insured," Mr. Lavergne is not afforded coverage for the claims against him in this case.[3]  Therefore, State Farm's Motion for Summary Judgment (Doc. 65) will be GRANTED as it applies to Mr. Lavergne's Business Policy.

> 3.   *Umbrella Policy*

Finally, State Farm maintains that no coverage exists under Mr. Lavergne's Umbrella Policy.  The relevant coverage term provides as follows: "**Coverage L - Personal Liability.** If you are legally obligated to pay damages for a **loss**, we will pay your **net loss** minus the **retained limit**." (Doc. 65-3, p. 3).  The term "loss" is defined, in relevant part, as "an accident that results in **personal injury** or **property damage** during the policy period." (Doc. 65-3, p. 1).  "Personal injury" under the policy

---

[3] Mr. Lavergne has also failed to offer any viable explanation as to how he may qualify as an "insured" under the policy.

includes "libel, slander, defamation of character or invasion of rights of privacy."
(Doc. 65-3, p. 2).  Read together, these provisions appear to extend coverage to
liability arising from negligent defamation claims.  However, State Farm asserts that
three exclusions under the policy preclude coverage: the "business pursuits"
exclusion,  the "intentional act" exclusion, and the "board of directors" exclusion.
Because we cannot determine that any of these provisions unambiguously excludes
coverage as a matter of law, State Farm's Motion for Summary Judgment (Doc. 65)
must be DENIED IN PART as it pertains to Mr. Lavergne's Umbrella Policy.

        a.    *The Business Pursuits Exclusion*

      The business pursuits exclusion withdraws coverage "for any loss caused by
your **business** pursuits or arising out of **business property**."  (Doc. 65-3, p. 4).[4]
"Business" is defined as "a trade, profession or occupation."  (Doc. 65-3, p. 1).  Mr.
Lavergne's involvement with PIVoD clearly did not constitute a "trade" or
"profession."  As such, the applicability of the term "occupation" is the only point of
contest regarding this exclusion.

      The policy does not define the term "occupation."  Outside of the policy,
however, "occupation" is defined as "[a]n activity or pursuit in which a person is
engaged; esp., a person's usual or principal work or business."  Black's Law
Dictionary 1106 (7th ed. 1999).  This definition comports with the ordinary, prevailing
meaning of the term.  Moreover, it highlights Mr. Lavergne's principal argument: that

---

[4] The term "business operations" was formerly used in Exclusion 6, but is replaced in the
Policy Endorsements section of the policy with the term "business pursuits."

his work with PIVoD was not his "primary job," but was rather an "investment opportunity." State Farm argues, by contrast, that Mr. Lavergne desired to profit from his involvement with PIVoD, and was actively involved in the operation of the company. Under the circumstances of this case, we do not grant summary judgment precluding coverage, because it is not entirely clear whether Mr. Lavergne's involvement with PIVoD constituted an "occupation." There are several unsettled points of fact in the record which, in and of themselves, may be sufficient reason to deny summary judgment. Nonetheless, to the better of our understanding of the evidence, a number of factors actually support our decision.

First, however, we must note that Mr. Lavergne was involved in PIVoD to a much larger extent than an average investor would have been. It was first Mr. Lavergne's idea to initiate contact with PIVoD's Australian parent company and to entice its officers to establish the business in Louisiana.[5] He was closely involved in the legal formation of PIVoD in the United States, and was listed as its original registered agent. Mr. Lavergne helped to consolidate the first group of investors in PIVoD, who then formed a separate limited liability company called Tech Opportunity, L.L.C. ("Tech Opportunity"). (Doc. 67-1, p. 19). He and the other members of Tech Opportunity invested $300,000 in PIVoD. He also played a crucial networking role for PIVoD by introducing its founder to a number of professionals in

---

[5] Mr. Lavergne claims that, at the outset, he was not interested in investing in the company to make a profit. Rather, he was motivated by the desire to encourage economic development in the city. (Doc. 67-1, p. 15).

10

the community[6], and was involved in the hiring of a "fundraiser" and a manager. Once PIVoD was formed and made operational, Mr. Lavergne served as a member of its "Board of Managers." (Doc. 67-1, p. 29).

For all of his efforts in cultivating PIVoD, Mr. Lavergne was compensated with, according to his deposition, shares of stock in PIVoD. The record is not entirely clear regarding the logistics involved in compensating Mr. Lavergne. It appears that PIVoD was a limited liability company, a form of juridical entity which does not typically issue shares of stock.[7] Nonetheless, these "shares" were given to him independently of his status as a member of Tech Opportunity. (Doc. 67-1, p. 42). Although it appears that Mr. Lavergne was compensated on an ongoing basis, we are not certain of the length of time during which compensation was transferred.[8] These remaining questions could impact our determination of whether Mr.

---

[6] Specifically, Mr. Lavergne stated that he introduced Phillip Jenkins, the founder of the company in Australia, to various individuals in Alexandria with whom he had done business. The purpose of these introductions (to lawyers and bankers, for instance) was to assist in the formation of PIVoD in Louisiana. (Doc. 67-1, p. 15).

[7] This Court's review of both the Louisiana statutes governing limited liability companies, La. R.S. § 12:1301 et seq., and the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., revealed no basis upon which "stock" may be issued by a limited liability company. Indeed, in Great Lakes Chemical Corp. v. Monsanto Co., the court held that interests in a Delaware limited liability company do not constitute "securities," or in other words, are not considered "stocks." 96 F. Supp. 2d 376, 383-84 (D. Del. 2000). Despite these facts, Mr. Lavergne's deposition testimony contains repeated references to his being issued stock shares as compensation for his services. (Doc. 67-1, p. 25). Those shares were purportedly evidenced by stock certificates. (Doc. 67-1, p. 25). Under the limited record before us, we are frankly confused about what type of business entity was actually formed - a corporation, or a limited liability company. Nonetheless, that question is irrelevant to our determination that Mr. Lavergne was compensated in some way.

[8] Mr. Lavergne testified that his fellow investors in Tech Opportunity were aware that he had a separate arrangement under which he was compensated for assisting with the formation of PIVoD. (Doc. 67-1, pp. 89-90). In fact, Mr. Lavergne stated that "three of the four partners [in Tech Opportunity] were with me in Australia when I negotiated my deal with Mr. Jenkins." (Doc. 67-1, p. 90).

11

Lavergne's work for PIVoD may be considered an occupation.  Up to this point,
however, no one has bothered to explain any of these issues.[9]

Critically, Mr. Lavergne maintained in his deposition that he was not involved
in the daily operations of PIVoD, and never held an "operational position" with the
company.  (Doc. 67-1, p. 46).  As noted above, he admittedly took an active role in the
formation of PIVoD in the United States, and remained a member of its Board of
Managers until he was removed from that position, ostensibly by a resolution
proposed by Mr. Medford.  (Doc. 67-1, p. 75).  But, it is undeniable that Mr. Lavergne's
"trade" was physical therapy, and that he was involved in a number of other
investments and business operations.  There is no definitive evidence before the
Court indicating that Mr. Lavergne's principal (or even secondary) work was
conducted as a manager of PIVoD.

This last observation naturally leads to other questions.  Is it necessary to
decide that Mr. Lavergne's "primary job" was to act as a member of PIVoD's Board of
Managers?  Or may we adopt the more generalized conception of the term occupation
as including part-time or secondary activities which generate income?  Can a person
have more than one "occupation" by the terms of the Umbrella Policy?  Finally, what
is the decisive factor in determining whether an activity constitutes an "occupation" -

---

[9] We are also singularly uninformed by the pleadings and evidentiary submissions as to
whether (1) Mr. Lavergne had any actual involvement or role in the preexisting Australian version of
PIVoD (and whether that makes any difference in any event); (2) whether somewhere there actually
was a stock-issuing entity at all; and (3) what connection, if any, there was between Mr. Lavergne and
PIVoD Capital International, L.L.C., an entity which is, according to the complaint, the "largest single
member by percentage" of PIVoD Technologies, L.L.C., the named plaintiff herein (Doc. 1, p. 2, ¶ 7).

the desire to profit from the activity, or the formal recognition of the activity as type of employment?  None of these questions are definitively answered by the terms of the policy or the arguments contained in either party's briefs.  The very fact that the Court is left to decide these questions precludes summary judgment.

State Farm has presented a cognizable argument that a mere investment opportunity - motivated by the desire to make a profit - is sufficient to constitute a business pursuit, at last in general terms.  Some Louisiana courts have intimated that profit motive should be a consideration in determining whether an activity constitutes a business pursuit.[10]  The Court is also aware of opinions considering insurance policies which define "business" to include "any full or part-time activity of any kind engaged in for economic gain."  E.g., Elorza v. Massey, 783 So. 2d 453, 455 (La. App. 5th Cir. 2001).  However, these cases are neither directly on point, nor determinative of the meaning that should be attributed to the terms "business pursuits" and "occupation" in this particular policy.  Again, Mr. Lavergne's Umbrella Policy defines the term "business" only as "a trade, profession or occupation" (Doc. 65-3, p. 1), and contains no further definitions.  Therefore, these cases are inapposite to the issue before the Court.

If Mr. Lavergne's Umbrella Policy defined the term "business" more broadly, or

---

[10] Melder v. La. Farm Bureau Mut. Ins. Co., 906 So. 2d 513, 516 (La. App. 1st Cir. 2005) (holding that the fact that an insured sold farming proceeds and claimed those proceeds as income was relevant to determining whether the insured's farming operations should be characterized as a "business"); Bowen v. Skillman, 622 So. 2d 1200, 1202 (La. App. 2d Cir. 1993) (holding that whether an insured raced horses for profit was a relevant factor in deciding whether a business pursuits exclusion applied).

13

the term "occupation" at all, our conclusion may be different.  Likewise, if the

evidence before the Court indicated more clearly that Mr. Lavergne's involvement

with PIVoD fell within the plain, ordinary, and uncontested meaning of the term

"occupation," then summary judgment may be appropriate.  As it stands, however,

genuine issues of material fact remain to be determined, and key terms in Mr.

Lavergne's Umbrella Policy remain ambiguous in this factual context.  The Court is

not unwilling to entertain a future motion for summary judgment when, or if, these

vagaries can be clarified.  At this juncture, however, State Farm must carry the

burden of persuasion on its own motion, and the Court must strictly construe

"equivocal provisions seeking to narrow an insurer's obligation" against the insurer.

See Huggins, 957 So. 2d at 129 (quoting Bonin, 930 So. 2d at 911).  Therefore, State

Farm's motion will not be granted on the basis of the business pursuits exclusion.

b.    <em>The Intentional Act Exclusion</em>

The intentional act exclusion prohibits coverage "for **personal injury** or

**property damage** . . . which is either expected or intended by [the insured]."  (Doc.

65-3, p. 4).  In other words, the Umbrella Policy does not provide coverage for tort

liability arising from intentional, rather than negligent, acts.  Both parties agree, and

the Court recognizes, that liability for defamation can arise from either intentional or

negligent conduct.  See Cyprien v. Bd. of Supervisors *ex rel.* Univ. of La. Sys., 5 So. 3d

862, 866-67 (La. 2009).  Because we cannot conclude that Mr. Medford's complaint

forecloses the possibility of liability through merely negligent conduct on Mr.

Lavergne's part, and because there is no evidentiary clarification, we find genuine

14

issues of material fact exist here too, and we cannot grant State Farm's motion for summary judgment.

As a general principal, intentional act exclusions serve to "'prevent an insured from acting wrongfully with the security of knowing that his insurance company will 'pay the piper' for the damages.'" <u>Breland v. Schilling</u>, 550 So. 2d 609, 613 (La. 1989) (quoting <u>Transamerica Ins. Group v. Meere</u>, 694 P.2d 181, 186 (Ariz. 1984)).  In interpreting an intentional act exclusion, the insured's subjective intent is paramount; the Louisiana Supreme Court has rejected "the approach, followed by certain courts, that an insured intends, as a matter of law, all injuries which flow from an intentional act."  <u>Id.</u> at 614.[11]  Thus, although it is clear that Mr. Lavergne intentionally communicated the allegedly defamatory information, the pertinent question is

---

[11] Some cases hold that intentional act exclusions which encompass injuries intended *or expected* by the insured "make[] subjective intent irrelevant if injury results from an intentional act." See, e.g., <u>Bridgefield Cas. Ins. Co. v. Tripp</u>, 943 So. 2d 632, 636 (La. App. 2d Cir. 2006).  However, such jurisprudence is neither unquestioned, nor dispositive here.  The Louisiana Supreme Court has required a link between the insured's act and the particular tortious consequences that flowed from it.  See <u>Breland</u>, 550 So. 2d at 613.  Likewise, the Umbrella Policy itself excludes coverage "for **personal injury** . . . which is either expected or intended by you," again linking the act and the specific injury which resulted from it.  (Doc. 65-3, p. 4).  The Louisiana Second Circuit court has offered the following interpretation of similar policy language:

> The phrase "bodily injury ... which is expected or intended" emphasizes that an excluded injury is one which the insured intended,*944  not one which the insured caused, however intentional the injury-producing act. Id.; Menard v. Zeno, 558 So.2d 744 (La.App. 3d Cir.), writ denied 561 So.2d 121 (1990). Not all injuries from an intended act will be excluded, only those injures which were intended. Id. An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur. Id. In determining if the act is intended, the court looks at the subjective intention and expectation of the insured.

<u>Steed v. St. Paul's United Methodist Church</u>, 728 So. 2d 931, 943-44 (La. App. 2d Cir. 1999).  In this instance, the injury or consequence that allegedly flowed from Mr. Lavergne's words was defamation.  Therefore, the fact finder in this case must still determine whether Mr. Lavergne subjectively intended or expected to defame Mr. Medford.

whether he expected or intended to cause defamatory injuries to Mr. Medford.

In his complaint, Mr. Medford alleges that Mr. Lavergne's statements were defamatory per se and, alternatively, that his "words, comments, and statements are merely susceptible of defamatory meaning." (Doc. 1, p. 6, ¶ 20). "In Louisiana, defamatory words have traditionally been classified into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning." Costello v. Hardy, 864 So. 2d 129, 140-41 (La. 2004).  When words are not defamatory per se, the plaintiff must prove the element of fault, which may amount either to negligence or intent.  See id.  In other words, Mr. Medford pled (albeit in the alternative) that Mr. Lavergne's words may not have been defamatory per se.

In summary,  the complaint leaves open the possibility that proof of fault will be required, and that such fault may rise only to the level of negligence, rather than intent.  Thus, while the factual allegations in Mr. Medford's complaint relate principally to intentional conduct, the complaint, read as a whole, leaves open the possibility of coverage.[12]  Therefore, we cannot conclude that the intentional act

---

[12]  Moreover, some Louisiana jurisprudence indicates that we may consider the defendant's version of the events in determining whether an intentional act exclusion applies.  For instance, the Louisiana Fifth Circuit court was unable to determine that an intentional act exclusion "unambiguously exclude[d] coverage" in a lawsuit arising from a physical assault.  See Graphia, 7 So. 3d at 717, 720.  In that case, the defendant-insured allegedly assaulted the plaintiff, and the defendant's insurer moved for summary judgment based upon an intentional act exclusion.  Id. at 717. In denying the motion, the court explained that " [i]t is unlikely that in his petition for damages caused by an attack, [the plaintiff] would have alleged that [the defendant] was acting in self-defense."  Id. at 719.  Therefore, the court looked to the defendant's answer and reconventional demand, which "present[ed] a factual situation whereby the insurance policy could be reasonably interpreted to cover the act committed by its insured."  Id.; see also Baggett v. Tassin, No. 09-CA-803, 2010 WL 1065746, at *4 (La. App. 5th Cir. Mar. 23, 2010) (denying an insurer's summary judgment motion based upon an intentional act exclusion because genuine issues of material fact regarding the insured's subjective intent remained as to the insured's self-defense theory).

exclusion definitively precludes coverage under Mr. Lavergne's Umbrella Policy, and State Farm's motion must be denied on that ground as well.

c.     *The Board of Directors Exclusion*

State Farm also alleges that coverage under the Umbrella Policy is prohibited by the board of directors exclusion, which withdraws coverage "for any loss caused by your act or omission as a member of a corporation's board of directors." (Doc. 65-3, p. 5). The exclusion "does not apply if the corporation . . . does not involve [the insured's] business." (Doc. 65-3, p. 5). This exclusion, like the business pursuits exclusion, is dependent upon the insured's affiliation with a business entity. As previously explained, serious factual issues remain at this point regarding the nature of Mr. Lavergne's affiliation with PIVoD. Yet, we need not rest our conclusion upon that problem.

Instead, we note that this exclusion specifically applies to members of a *corporation's board of directors*. The evidence before the Court precludes summary judgment on this point because, to the best of our understanding: (1) PIVoD was not

---

In this case, Mr. Lavergne denied the allegations in Mr. Medford's complaint that he embarked on an intentional campaign to defame Mr. Medford. (Doc. 9, p. 2, ¶¶ 8-9). Moreover, Mr. Lavergne asserted the following affirmative defenses: (1) the defenses of absolute and substantial truth; (2) qualified immunity; (3) that any disputed statements "allegedly made by . . . [Mr. Lavergne] . . . do not rise to the level of false facts or actionable statements"; (4) any injuries incurred by Mr. Medford were "caused by the negligence or fault of others over whom [Mr. Lavergne] has no right of control and for whose acts [Mr. Lavergne] is not responsible"; and (5) that Mr. Lavergne's acts are not accountable for any damage sustained by Mr. Medford. (Doc. 9, pp. 6-7, ¶¶ 29-34). Finally, Mr. Lavergne's answer also contains a counterclaim, asserting that "[a]ll of [Mr.] Lavergne's e-mails and communications to [Mr.] Medford and others . . . were efforts to ensure that [Mr.] Medford followed the corporate formalities and acted appropriately in running the corporation for the benefit of the shareholders." (Doc. 9, p. 9, ¶ 8). These averments at least present issues of fact as to whether Mr. Lavergne intended or expected his statements to result in defamatory damages to Mr. Medford. Graphia, 7 So. 3d at 719-20. Although we need not decide the motion based upon these facts, it is worth noting that some courts have looked beyond the bare allegations of the complaint in deciding similar motions.

a corporation, but was instead a limited liability company; and (2) Mr. Lavergne was not a member of a corporation's board of directors, but was a member of a limited liability company's "Board of Managers."  Neither difference is insignificant.  Indeed, the exclusion likely exempts board members of a corporation because of the special liability protections afforded to board members by virtue of the position itself.

State Farm argues, however, that Mr. Lavergne filled a role that is the "functional equivalent" of a member of a corporation's board of directors.  That statement, however, requires both an extrapolation (and perhaps, an unwarranted deviation) from the plain language of the policy, and a resolution of disputed fact issues.  As explained previously, there may be some confusion in the record as to the type of corporate entity that was formed.  Ignoring that problem, however, there is still no evidence that serving as a member of PIVoD's Board of Managers is the functional equivalent of serving as a member of a corporation's Board of Directors.  Even if there was such evidence, however, the exclusion contains no "functional equivalent " clause, but instead specifically applies specifically to members of a corporations's board of directors.[13]  The Court is obliged to apply the unambiguous language of the policy in this instance.  Therefore, summary judgment may not be granted based upon the board of directors exclusion.

    4.    *Duty to Defend*

For purposes of clarity, we now address State Farm's duty to defend Mr.

---

[13] State Farm has not provided the Court with precedent or evidence supporting its "functional equivalent" argument, and we are unwilling to retroactively infuse State Farm's interpretation into the language of Mr. Lavergne's Umbrella Policy.

18

Lavergne in this lawsuit. Generally, "[u]nder Louisiana law, 'the scope of the duty to defend under an insurance agreement is broader than the scope of the duty to provide coverage.'" Coleman v. Sch. Bd. of Richland Parish, 418 F.3d 511, 523 (5th Cir. 2005) (quoting Suire v. Lafayette City-Parish Consol. Gov't, 907 So. 2d 37, 51-52 (La. 2005); accord Graphia v. Schmitt, 7 So. 3d 716, 718 (La. App. 5th Cir. 2009) ("Generally, an insurer's obligation to defend suits against its insured is broader than its liability for damage claims."). Moreover, if a complaint contains a single claim for which a policy provides coverage, then the insurer is obligated to defend the entire lawsuit. Coleman, 418 F.3d at 523. In other words, "[t]he insurer's duty to defend suits brought against its insured is determined by the allegations of the plaintiff's petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage." Elliott v. Cont'l Cas. Co., 949 So. 2d 1247, 1250 (La. 2007). The insurer's duty to defend arises if there is "even a possibility of liability under the policy." Id. Courts must liberally construe plaintiffs' allegations to determine whether an insurer is obligated to provide a defense to its insured. See Graphia, 7 So. 3d at 718.

As noted above, the complaint does not foreclose all possible scenarios under which Mr. Lavergne may be entitled to coverage under his Umbrella Policy. As such, we cannot conclude, at least at this point, that State Farm has no duty to defend the claims in this lawsuit. State Farm's Motion for Summary Judgment (Doc. 65) will be DENIED IN PART as it pertains to its duty to defend Mr. Lavergne under the Umbrella Policy.

19

### III.   **Conclusion**

For the foregoing reasons, Third Party Defendant State Farm's Motion for

Summary Judgment (Doc. 65) will be GRANTED IN PART AND DENIED IN PART, as

specified above.  Only the issue of potential coverage under Mr. Lavergne's Umbrella

Policy remains in dispute.

SIGNED on this 22 day of July, 2010 at Alexandria, Louisiana.

DEE D. DRELL
UNITED STATES DISTRICT JUDGE